CITY OF DETROIT v. DETROIT UNITED RAILWAY.[1]

1. MUNICIPAL CORPORATIONS—EQUITY JURISDICTION—EJECTMENT —ADEQUATE REMEDY AT LAW—HIGHWAYS AND STREETS.

The city of Detroit has no such beneficial interest in the streets of the municipality as to entitle it to maintain ejectment against a street railway corporation that continues to occupy its streets after the expiration of its franchise and without permission; the city may maintain suit in equity to compel the removal of the tracks.

2. SAME—TRESPASS—CITIES.

Such occupancy of the streets without right is a continuing trespass which the city may enjoin by bill in chancery.

3. SAME—EQUITY—REMEDY.

After obtaining jurisdiction of a suit to enjoin a continuing trespass, the court should give such relief as to finally dispose of every question involved.

4. SAME—FRANCHISE—EXPIRATION.

It cannot be held that an implied obligation exists after the termination of a franchise to permit the grantee or some other organization to continue the operation of the tracks so laid and remaining in the streets upon reasonable terms so long as the requirements of the public may warrant.

5. SAME—CONSTRUCTION.

Upon the expiration of the period limited in the franchises, the rights of the railway company terminated unless extended by mutual arrangement.

6. SAME.

The rights of the defendant railway company were not extended by an ordinance of May, 1906, whereby complainant required defendant to issue tickets at a specified rate for certain hours of the day, during the entire term of its existing franchises.

7. SAME—CONSTRUCTION OF FRANCHISE—STREET RAILWAYS.

The construction of a franchise, if it is susceptible of two interpretations, is always in favor of the municipality: all rights asserted against the grantor must be clearly defined and not raised by inference or presumption.

8. SAME—IMPROVEMENTS—ESTOPPEL.

Until the rights of defendant arising from the contractual re-

---

[1] Removed to United States Supreme Court, March 18, 1913.

lations between the parties had expired, complainant could not interfere to require or prevent improvements of the defendant corporation, and therefore the city was not estopped from treating the franchise as terminated because of any improvements and betterments that defendant may have made upon the line of railway covered by the expired franchises.

9. SAME—ESTOPPEL.

Against a municipality no estoppel arises because of inaction on the part of its officials.

10. SAME—LANDLORD AND TENANT—RENT OF STREETS.

The relation between complainant and defendant, after the expiration of certain franchises held by defendant, was not the same as that of a landlord to a tenant holding over.

11. SAME.

And except by mutual agreement, the city could not arbitrarily fix the rent which defendant should pay for the trespass if it continued to operate the lines of railway therein.

12. SAME—MICHIGAN RAILWAY COMMISSION.

Nor has the legislature conferred upon the Michigan railroad commission exclusive jurisdiction to determine such a controversy: it was not the intention of the legislature to interfere with the authority of municipalities over their streets. Const. art. 8, § 28.

13. SAME.

Upon the expiration of defendant's franchises, it became a trespasser in the streets covered by them, while the city of Detroit became entitled to compel such corporation to vacate the streets, to remove its property within a reasonable time, and to enforce its rights by writ of assistance from the court of equity.

14. SAME—PROPERTY RIGHTS.

But the defendant street railway company retains its property rights in the materials, etc., and is given a reasonable time in which to remove its tracks and other property.

15. SAME—NUISANCE.

Defendant is not held to have created a nuisance in the public streets.

Appeal from Wayne; Murphy, Hosmer, and Mandell, JJ. Submitted June 4, 1912. (Docket No. 3.) Decided October 1, 1912.

Bill by the city of Detroit against the Detroit United Railway for an injunction and other relief. Defendant filed a cross-bill. From a decree granting partial relief, both parties appeal. Modified and affirmed.

*Brennan, Donnelly & Van De Mark* (*Charles D. Joslyn, Hinton E. Spalding*, and *William L. Carpenter*, of counsel), for appellant.

*Richard I. Lawson* (*Alfred Lucking*, of counsel), for appellee.

McALVAY, J. This litigation has arisen from disagreements between the parties relative to the respective rights of each arising from their relations to each other under certain street railway grants made to defendant and its predecessors in title to occupy certain streets, all now included within the limits of said city, for the purpose of constructing and operating thereon a street railway.

Before the statement of the material facts in the case is made, a brief outline of the pleadings will be helpful to an intelligent understanding of the relation of such facts to the questions involved. The complainant, claiming to be entitled to relief in a court of equity, sets forth in its bill of complaint that the franchises and rights of defendant in that portion of its railway system in the city of Detroit called the "Fort Street Division" had expired, and, in view of that fact, before such expiration, certain resolutions were adopted by the city authorities declaring that such franchises would expire on dates named, and that defendant could continue to operate on said street only upon certain terms and conditions specified, including the payment of $200 per day to the complainant for the use of said streets. The bill shows that defendant denied such expiration of its franchises, and denied the right of complainant to impose such terms, and continued to occupy and use the streets with all its equipment thereon located, and to operate its street railway thereon in defiance of the demand of complainant. The bill of complaint prays that

the rights of the railway company in the streets be decreed to have expired on the dates specified in the resolutions; that by operating after the expiration of its franchises it be decreed to have accepted the terms of the resolutions and be compelled to pay the charges fixed therein; that an accounting be had to ascertain the amount due and owing; that defendant be perpetually enjoined, unless conforming with the terms of such resolutions by payment of the full amount arising thereunder, from running and operating its street cars upon said streets, and be required to remove its railway equipment therefrom. There was also a prayer for general relief.

Defendant's answer denies that its franchises had expired, as alleged in said bill; insists that it still has the right to continue to operate upon said streets, notwithstanding the resolution and notices thereof from complainant. It admits its refusal to pay $200 per day for the use thereof, and declares its intention to continue to occupy and use the streets in defiance of complainant's claims and the action of the municipal authorities. Defendant charges that the sum of $200 per day is excessive as compared with the $300 per day previously fixed by the city for other lines where franchises had expired, and that the charge in proportion for the Fort street division should not exceed $40 per day, and denies the jurisdiction of a court of equity to grant relief. The cross-bill portion of the answer sets up that by agreement with the city, May 2, 1906, being an ordinance of that date, complainant, in effect, extended the company's rights on the Fort street division until December 14, 1921; also that the sum of $200 per day, fixed by the complainant for the use of the streets, exceeds the net earnings of the Fort street line, and is unreasonable and confiscatory; that the resolutions mentioned constitute a cloud on defendant's title, and are in violation of the Constitution of the United States; that to grant complainant's claims and to discontinue such street railway service would greatly injure the people of the city of Detroit; that, notwithstanding the time limit

placed upon the franchises granted to the defendant, it was the contemplation of the parties that defendant should continue to operate until the agreements were changed by the mutual consent of both parties, and that, notwithstanding the grants from the city, defendant has the right to operate its railway and charge toll therefor to its passengers; that defendant under its franchises was subjected to a public duty and obliged to continue its performance in perpetuity. The answer prays that complainant be restrained from collecting the $200 per day mentioned, and enjoined from interfering with the right of defendant to operate on the Fort street division and for general relief.

Three certain grants or franchises to operate a street railway, and the only ones involved, were given to those through whom defendant has acquired title, part of them within the city of Detroit, and part, at the time of the grants, beyond the limits of the city. By the addition of contiguous territory to the city of Detroit before this litigation was instituted, all of the streets upon which these franchises were granted were included within the limits of the city, and are now a part of the Fort street division of defendant railway. The first grant referred to was under date of January 31, 1865, and extended from the then western boundary of the city at Twenty-Fourth street easterly upon Fort street, and then through intermediate streets to the then eastern city limits. It was for a period of 30 years and was extended for a period of 30 years from June 30, 1880, expiring June 30, 1910. Another grant was given by the township of Springwells June 17, 1880, which connected with the terminus of the first grant at the intersection of Fort and Twenty-Fourth streets, thence south on Clark street to Jefferson avenue, thence west on Jefferson avenue to Artillery avenue. It was for the period of 30 years, expiring June 17, 1910. This was the franchise taken into the city in the territory annexed June 20, 1885. After this annexation to the city, the common council by ordinance on July 24, 1886, granted the right

to operate a street railway along Fort street from the western terminus of the first grant to the newly established city boundary, which was at the line of Artillery avenue. The life of the ordinance was fixed "for the term of twenty-four years from the date of the passage of this ordinance," and therefore terminated on July 24, 1910. The order of dates of the expiration of these grants, by limitation, would occur June 17, June 30, and July 24, 1910, respectively. Another ordinance, and the one which is claimed by defendant to extend the three foregoing grants on the Fort street division to December 24, 1921, was passed by the common council of complainant May 2, 1906, and is entitled "An ordinance in relation to rates of fare on Fort street railway lines of the Detroit United Railway." Its terms and provisions will be stated when its claimed relation to the expiration of these franchises is considered. On September 26, 1905, an ordinance was introduced in the said common council, which was amended and finally passed March 3, 1908. It is entitled "An ordinance providing for the operation of cars on or in any street on which the franchise right has expired." This ordinance, by its terms, as indicated in its title, imposed on those portions of defendant's system where the grants were about to expire regulations and requirements as to rates of fare and transfers, fixing three cent fares if purchased in strips of five tickets, with universal transfers; also as to maintaining pavement between the tracks and for a distance outside of same. It also required defendant to change its routes on request, and remove tracks and overhead equipment. It gave greater control to the council as to the kind and number of cars to be used and the kind of service, and required a change of grade when directed. It also contained a general provision making defendant subject at all times to regulations which, from time to time, might be deemed necessary by complainant's council, and general provisions also as to violations of these provisions and punishment therefor, thereby changing in material respects the requirements

then imposed upon the defendant company under its franchises. This is known in the record as the "Hally Ordinance." It is claimed by defendant—

"That the purpose of said ordinance was to compel this defendant to continue the operation of its cars at reduced rates of fare, and under other terms and conditions stated in said ordinance."

Before this ordinance was published, the Guaranty Trust Company of New York, as trustee for certain bondholders under a mortgage on the property of the defendant company, filed a bill in the Federal circuit court for the eastern district of Michigan, and obtained a restraining order against complainant taking steps to enforce said ordinance and from publishing the same or doing any action in relation thereto. In this suit defendant filed an answer and cross-bill, which complainant answered. It is now at issue and pending in the said court.

Some time prior to the dates of the expiration of the three franchises mentioned and described, under which defendant obtained its right to operate its street railway on the Fort street division, the common council of complainant passed three certain resolutions in relation thereto. The first was passed June 14, 1910, and related to the franchise expiring June 17, 1910. The second was passed June 21, 1910, and related to the franchise expiring June 30, 1910. The third was passed July 19, 1910, and related to the two franchises just referred to, and also to the third franchise expiring July 24, 1910. These resolutions are identical as to the material matters contained in them, except that the third refers to the action of the common council taken in the first and second, and fixes the *per diem* charge at $200, to cover the entire Fort street division involved in this litigation. It will be necessary, therefore, only to set out the third resolution, which is as follows:

"July 19, 1910.

"By Ald. Ellis:
"Whereas, the common council of the city of Detroit at

a session on June 14, 1910, declared by resolution that the franchise right of the Detroit United Railway as the successor in title to operate street cars on Fort street west from the west line of the Porter farm to Clark avenue; thence south on Clark avenue to River street (Jefferson avenue west); thence westerly on the last named highway to a point opposite Fort Wayne, would expire on June 17, 1910; and

"Whereas, said common council, at a session held on the 21st day of June, 1910, declared by resolution that the franchise right of the Detroit United Railway as the successor in title to operate street cars on the whole of the system formerly known as the Fort Wayne & Belle Isle Railway Company's line, which is east of the west line of the Porter farm, the particulars of which are more fully set out in said resolution and in the ordinances of the city of Detroit, would expire on June 30, 1910; and

"Whereas, said resolutions expressed the truth, and said franchise rights respectively did, on June 17, 1910, and June 30, 1910, cease to exist; and

"Whereas, the Detroit United Railway erroneously assumed that by the passage of said resolutions the city of Detroit was making it an offer which it was free to decline and negotiate for other terms, did on July 5, 1910, and in a communication to the common council, did decline to accept the terms in said resolutions contained; and

"Whereas, there is now pending in the circuit court of the United States for the eastern district of Michigan, southern division, a case entitled *Guaranty Trust Company of New York* vs. *City of Detroit and Others*, which involves the validity of an ordinance passed by the common council of the city of Detroit and commonly called the 'Hally Ordinance,' which ordinance, among other things, prescribed the terms and conditions under which a street railway might continue to operate cars when and where its franchise right to do so had expired; and

"Whereas, the court has issued a temporary injunction whereby the city of Detroit, its agents, servants and attorneys are strictly restrained and enjoined from publishing or attempting to publish that ordinance and are likewise enjoined from enforcing or attempting to enforce by any means whatever the said ordinance; and

"Whereas, said ordinance is without force or effect

until published and it is the duty of the city of Detroit to obey the mandate of the court; and

"Whereas, the franchise right of the Detroit United Railway as the successor in title to operate a street railway on Fort street west, beginning at Clark avenue; thence westerly to Artillery avenue, will have expired on July 24, 1910, and the city of Detroit has granted no franchise right to operate cars on said streets or portions of streets after July 24, 1910; and

"Whereas, all of said streets and portions of streets would after July 24, 1910, be subject to the terms and conditions of the Hally ordinance, if the same is a valid enactment and is accepted by the Detroit United Railway; and

"Whereas, no term franchise or agreement under the revised constitution can be valid or binding unless the franchise or agreement shall have first received the affirmative vote of three-fifths of the electors of the city; and

"Whereas, under the revised Constitution every street railway company is denied the right to use the highways, streets, alleys or public places of any city without the consent of the duly constituted authorities of such city, and is denied the right to transact a local business in the city without first obtaining a franchise therefor from such city:

"Therefore, be it resolved, that upon the following terms and conditions and upon no other, consent, permission and authority is hereby granted to the Detroit United Railway to continue from day to day after July 24, 1910, to operate its cars upon the streets and portions of streets last above set forth, as well as the streets and portions of streets set forth in said resolutions of June 14 and June 21, 1910, under the same terms and conditions, except as to percentages on gross receipts, now prevailing in the city of Detroit, whether due to contract agreement or not, upon the payment by the Detroit United Railway to the city treasurer of all sums and demands specified by the resolutions of June 14 and June 21, 1910, and which have not been paid, up to and including the 24th day of July, 1910, and thereafter upon the payment weekly by the Detroit United Railway to the city treasurer of the sum of two hundred dollars for each day that the streets and portions of streets set forth in said resolutions of June 14 and June 21, 1910, are used by said company in the operation of its railway or railways, and except upon the foregoing

terms and conditions, consent, permission and authority are hereby refused and denied; and

"Be it further resolved, that this resolution is subject to revocation at any time at the will of the common council or of the people of the city of Detroit."

Official notice of all of these resolutions, with copies thereof, were duly served upon defendant. To the first and second defendant replied as follows:

"Detroit, June 30, 1910.
"To the Honorable the Common Council,
"*Gentlemen:*

"We have received official notice of two resolutions adopted by your honorable body, one under date of June 14, 1910, requiring, for the reasons stated therein, the Detroit United Railway to pay fifty dollars per day additional to the city, and one under date of June 21, 1910, requiring the company for like reasons to make a further payment of one hundred dollars per day.

"We are compelled to advise you that we deny the statement contained in the preamble in each resolution to the effect that the rights of the company have expired on the streets mentioned in said resolution. We are also advised that the requirements to pay said sums of money are illegal for other reasons. We are, therefore, compelled to advise you that we must decline to pay said sums.

"Perhaps it may not be inappropriate to say to you that the increase of the *ad valorem* tax which has been made this year, added to the excessive demands now being made, has prevented us from completing our arrangements for borrowing the money necessary to make all the extensions required by your recent resolutions which we accepted. These resolutions, with other necessary improvements and betterments which we have contemplated, call for the expenditure of nearly two million dollars. The addition of such burdens as you seek to impose upon us and the threat to add still others puts it beyond our power to raise the money for the purposes above indicated.

"When your honorable body adopted the resolution regarding the payment of three hundred dollars per day, we then advised you that we did not regard the requirement as a legal one, but in the hope of avoiding litigation and further friction between us, and without waiving our legal

rights, we have paid that sum, and for the present will continue to pay it, under the conditions named in our letter advising you that we would. This was with the belief that no further burdens would be added.

"We do not believe that you have fully considered the necessary effect of the imposition of these heavy financial burdens upon the company, and therefore respectfully call your attention to it.

"We believe we should again call your attention to the failure of the city to properly maintain the track and paving foundations and the paving on the lines known as the Detroit Railway System, and in this connection we beg to call your attention to our letter to his honor, the mayor, concerning this matter. This company is at all times ready to co-operate with your honorable body in bringing about a better state of affairs concerning these and all other street railway lines in this city, consistent with a reasonable protection of the property in its charge.

"Within the next few days we will give to the public a statement respecting this company's undertakings, involving the outlay of much capital for additions and betterments during the current year.

"Respectfully yours,
"J. C. HUTCHINS,
"President."

Defendant also replied to the third resolution, as follows:

"July 26, 1910.
"To the Honorable the Common Council,
"Gentlemen:

"We have received official notice of a resolution adopted by your honorable body, under date of July 19, 1910, requiring for the reasons stated therein the Detroit Railway to pay $200 per day in addition to the $300 per day now being paid by this company.

"We suppose that this resolution stands as a substitute for two other resolutions, one under date of June 14, 1910, requiring a payment of $50 and the other under date of June 21, 1910, requiring the company to make a payment of $100 per day.

"We are compelled to advise you that we deny the statement contained in the preamble of said resolution of July 19, 1910, to the effect that the rights of the company have expired on the streets mentioned therein. We are also advised that the requirements to pay such sums of

money are illegal for other reasons. We are, therefore, compelled to inform you that we decline to pay said sum of $200 per day in addition to the sum we are now paying.

" We also desire to reiterate what we said to you under date of June 30, 1910, and ask you to consider the statement therein contained as a part of this letter.

" Very truly yours,<br>" J. C. HUTCHINS,<br>" President."

The contention of defendant first to be considered is that which disputes the jurisdiction of a court of equity in this case, upon the ground that complainant has a complete and adequate remedy at law by an action in ejectment. In the briefs and in the argument upon the hearing before this court there was a divergence of views as to the character of the occupancy of the defendant company upon the streets of the complainant city. It was claimed that such occupancy of these streets by defendant after the expiration of its franchises was in the nature of a tenancy at will, and, upon that view, that the proceeding against it should have been on the law side of the court. Another claim was that the rights granted to defendant amounted to a right of way or an easement rather than a tenancy. At this time it will not be necessary to devote much attention to the nature of this occupancy. In this State it is provided by statute that no person may bring an action in ejectment to recover possession of land, unless at the time he has a valid subsisting interest in the premises claimed. A municipality acquires no beneficial ownership of the land dedicated to the public use as a street. It has no title or interest in the public street of which it can divest itself by deed or other conveyance. The use of such land has already been determined by the dedication to the public use. By Constitution and statute the supervision and reasonable control of all streets are given to municipalities, but such powers extend no farther. Complainant, therefore, has no such interest in the premises, within the meaning of the statute, as would authorize it to bring ejectment to oust defendant from its streets, and this court has so

held in *City of Grand Rapids* v. *Whittlesey*, 33 Mich. 109. See, also, *Bay County* v. *Bradley*, 39 Mich. 163 (33 Am. Rep. 367); *Taylor* v. *Gladwin*, 40 Mich. 232. This is conclusive upon the question as to the right of complainant to bring ejectment against defendant. It is therefore not necessary in this connection to discuss the question of the adequacy of the remedy. This court has held that a municipality may· maintain a bill in equity against a street railway company unlawfully occupying a highway to compel the removal of its tracks. *Township of Bangor* v. *Electric Co.*, 147 Mich. 165 (110 N. W. 490, 7 L. R. A. [N. S.] 1187, 118 Am. St. Rep. 546).

This occupancy of the street unlawfully, as claimed by complainant, was a continuing trespass for the restraint of which complainant was entitled to a writ of injunction, as well as for its removal. *Rhoades* v. *McNamara*, 135 Mich. 644 (98 N. W. 392).

In this case the court said that, where equity has jurisdiction of a suit to enjoin a continuing trespass, it should give such relief as would finally dispose of every question involved. This is but the reaffirmance of a well-known principle frequently declared by this court, and applies to all cases where equity has once obtained jurisdiction. It is the contention of the defendant in this case that its rights to use the streets. and operate its railway thereon continued indefinitely, even though the original grant was limited to 30 years, and even though never extended by consent of the city; and also that the railway company, having expended considerable sums in improving tracks, equipment, etc., the city is estopped from insisting upon the expiration of the franchise, or interfering with its continued duration. This is without reference to its contention that these franchises were extended to December 14, 1921, by the ordinance of 1906.

The first contention just stated in the argument advanced is based upon the claim of an implied obligation resting upon both parties, after the termination of the period for which the right to operate is granted—

"That the tracks and other equipment composing such railway shall, so long as the public need for the use thereof remains, continue to be used for railway purposes upon such terms, not unreasonable, as the municipal authorities may prescribe; that at the option of the municipality such operation may be continued by the original grantee of the franchise or by some other organization, provided, however, that in the latter case, payment of the fair value of said property shall first be made to the owner thereof."

While this is not all of defendant's claim as to the relation of the parties after the expiration of the franchises, it is made prominent in its brief by black-faced type, and is a sufficient excerpt therefrom to signify that its claim is that the material of the railway must remain permanently. It is true that this is somewhat modified by other argument. This argument seems to be based upon the assumed necessity of the continued use of the tracks of defendant for the comfort and prosperity of the public. It is evident that the municipal authorities are duly constituted as representing the people of the city, and it is the only governmental agency provided, as municipalities are now constituted, for conserving the interests of the public. For the purpose of carrying out these views of defendant no method is formulated, and there does not appear to be any which the court may utilize unless the idea of perpetuity is accepted. The constitutional agency provided to conserve the interests of the public has in this case expressed what may be considered the desire of the public relative to its interests. We think that in advancing this argument the fact is overlooked that constitutionally enacted statutes and ordinances have provided when the terms of these franchises expire, and also determined the contractual relations which were created by the acceptance of franchises lawfully granted. Taking, as we do, this view of the situation, we do not recognize the existence of the implied obligation claimed.

By the terms of the ordinances creating these franchises, they terminated by limitation, June 17, June 30, and July 24, 1910, respectively. The rights of defendant created

by these grants, unless, as is claimed, there was some extension given, expired contemporaneously with the franchises. These franchises, granted by the complainant municipality to the defendant company and accepted by it, constitute in law contracts mutually binding upon both parties. By their terms, as already stated, they expired by limitation. This and other courts have repeatedly held to this effect. *Grand Rapids Bridge Co.* v. *Prange*, 35 Mich. 400 (24 Am. Rep. 585); *Rapid Railway Co.* v. *City of Mt. Clemens*, 118 Mich. 136 (76 N. W. 318); *Traverse City Gas Co.* v. *City of Traverse City*, 130 Mich. 22 (89 N. W. 574); *Horner* v. *City of Eaton Rapids*, 122 Mich. 117 (80 N. W. 1012); *Scott County Road Co.* v. *Missouri*, 215 U. S. 336 (30 Sup. Ct. 110); *Louisville Trust Co.* v. *City of Cincinnati*, 76 Fed. 296, 308, 22 C. C. A. 334; *Id.* (C. C.) 78 Fed. 307; *Cleveland Electric R. Co.* v. *City of Cleveland*, 204 U. S. 116 (27 Sup. Ct. 202); *City of Detroit* v. *Railway Co.*, 184 U. S. 368 (22 Sup. Ct. 410).

Were these franchises extended by the ordinance of May 2, 1906? It is urged by the defendant company that they were. The grants referred to in the first preamble of said ordinance, given below, were granted by the township of Springwells in 1889 and 1891 and expire in 1921, and affect no territory east of Artillery avenue, which is the western limit of the expiring grants involved in this suit. These grants were in the territory of Springwells township west from Artillery avenue to the River Rouge, which was annexed to the city in 1905, and such grants are not questioned or involved in this suit. The date of their expiration, December 14, 1921, is the date to which defendant contends the expiring grants were extended. This contention will now be considered.

To ascertain the subject concerning which these contracting parties had negotiated, which brought about the enactment of this ordinance and its acceptance, we naturally first turn to the enacting clause, which reads as follows: "An ordinance in relation to rates of fare on Fort

street railway line of the Detroit United Railway." The preambles which follow this notify us (1) that defendant, as successor of the original grantees, owned and operated lines of street railway west of Twenty-Fourth street, constructed, maintained, and operated under grants by the township board of the township of Springwells, which provided for a five-cent rate of fare from any point in said township to any point in Detroit on said lines; and (2) that by legislative act of June 8, 1905, annexing part of said township to the city of Detroit said lines of railway are now within the city; and (3) that complainant city claimed that defendant should put on sale on its cars tickets at the rate of eight for twenty-five cents, each of which to be good for a continuous route on the above lines, whether constructed under township grants or ordinances of the city during certain hours of the day (this claim of the city was upon the contention that the ordinance relative to sales of workingmen's tickets within the limits of the city included the territory added later); and (4), in terms—

"The company and the city agreed that the said several grants of said township may be modified as provided in section 1, hereinafter set forth, provided the other terms and conditions of such township grants are not to be affected in any way by this agreement."

By the foregoing entitling of this ordinance and the preambles following, the only subject concerning which an agreement was to be entered into was in relation to rates of fare on the Fort street lines, and the four preambles distinctly set forth the reasons for such an agreement, as is distinctly shown by the following words:

"Therefore [*i. e.*, by reason of the matters contained in such preambles], it is hereby ordained by the people of the city of Detroit:

"Section 1. The Detroit United Railway shall for the full term of said township grants, issue and sell tickets at the rate of eight tickets for twenty-five cents, each of said tickets to be good for a continuous ride between any two

points on what is known as the routes of the Fort Wayne & Elmwood Railway lines, so called, whether constructed under grants from the township of Springwells or from the city of Detroit, between the hours of 5 a. m. to 6:30 a. m., and the hours of 4:45 and 5:45 p. m.; but the terms of said township grants in all other respects shall not be modified nor changed, nor shall this ordinance and the acceptance thereof be construed to abridge, enlarge or extend any rights acquired by said railway company, or its assignors or predecessors in title under said several grants from the township of Springwells."

This, as stated, is the section relied upon by defendant as the basis of its claim that the expired franchises hereinbefore mentioned were extended to December 14, 1921.

It is urged by defendant that its construction that this ordinance extended these franchises in question until 1921 is the only reasonable construction which may be applied to it without eliminating certain portions, and is the necessary construction by inference and presumption. In support of this contention, defendant relies upon the case of *Binghamton Bridge*, 3 Wall. (U. S.) 51, and quotes and relies on the interpretation of legislative contracts laid down in the majority opinion. For the purpose of showing the nature of the case the court was considering, we quote from the syllabus of that case, as follows:

" The statute of a State may make a contract as well by reference to a previous enactment making one, and extending the rights, etc., granted by the statute in question to a new party, as by direct enactment setting forth the contract in all its particular terms. And a third contract may be made in a subsequent statute by importation from the previously imported contract, in the former statute, and a fourth contract by importation from a third."

The case is an interesting one and the opinion long. It is apparent that the question presented was entirely different from that involved in the instant case, and decides, as far as the point claimed is concerned, only that the legislature may embody by reference into a subsequent

act the terms of a previous legislative contract enacted by it.

It is our opinion that the construction claimed by defendant can only be accepted by importing into this ordinance terms not within the intention of the parties.    The construction of such a contract, where susceptible of two meanings, is always in favor of the municipality, where one favors the extension of the rights of a corporation and the other against it.    All right asserted against a municipality must be clearly defined and not raised by inference or presumption.    *Cleveland Electric R. Co.* v. *City of Cleveland*, 204 U. S. 139, 140 (27 Sup. Ct. 202) *et seq.*, citing *Blair* v. *City of Chicago*, 201 U. S. 400, 471 (26 Sup. Ct. 427); *Binghamton Bridge*, 3 Wall. (U. S.) 51, 74, 75.    We think that it is not necessary to give this ordinance a construction by inference and presumption, and hold that by its plain and unambiguous terms it was restricted to a modification of the township grants as to rate of fare, and any and all other changes or modifications of the terms of said township grants to this railway company were expressly excluded.

It is claimed by defendant that the complainant is estopped from insisting upon the expiration of these franchises by its acts in the premises under which defendant was induced to expend large sums of money in betterments and replacements, instead of ordinary repairs. From the record it appears that, until the rights of defendant by reason of the contractual relations between the parties expired, complainant had no right to interfere with the conditions of such grants, to prevent defendant from making improvements of any kind on its property, or to require the same to be made.    *City of Detroit* v. *Railway Co.*, 184 U. S. 382 (22 Sup. Ct. 410) *et seq.*, and cases cited.    Except by the inference claimed to have arisen from the ordinance of 1906, no acts of complainant are shown which would warrant any argument supporting an estoppel, and our construction of this ordinance would seem to leave no support on which this contention

might rest, except inaction and passive conduct of the complainant. It is well settled that no estoppel will arise against a municipality through inaction of its officials. *Horner* v. *City of Eaton Rapids, supra; Collins* v. *Township of Grand Rapids,* 108 Mich. 675 (66 N. W. 586); *Township of Bangor* v. *Electric Co., supra.* We hold, therefore, that these franchises were not extended by the ordinance of 1906, but expired by their terms on the respective dates hereinabove given, at which time the contractual relations between these parties ended, and all rights in the defendant company to occupy the city streets and maintain and operate a street railway thereon terminated.

Complainant insists that, after the expiration of the franchises, it had the right to fix any terms it saw fit for the future use of these streets for the operation and maintenance of the street railway, and that any use by the defendant company of such streets for such purposes, beyond the expired term, under the circumstances, would be an acceptance of such terms. This contention, as stated in complainant's brief, is based upon the assumption that the relations between the parties were "in all respects analogous to those existing between a landlord and tenant of real estate under similar circumstances."

The matter of defining the relations between these parties under the circumstances of this case is not without its difficulties. We think, however, that complainant in stating its contention that the relations in all respects are analogous to the relations between landlords and tenants of real estate under similar circumstances makes an impossible comparison, for the reason that similar circumstances could not arise between an ordinary landlord and tenant. In the instant case the municipality, which has but a circumscribed interest in the streets, has granted the right to defendant to occupy certain portions of its public streets for the purpose of maintaining and operating thereon a street railway, under certain terms and conditions accepted by it, for a certain length of time, which has expired. This

presents a relation which cannot be described as a tenancy. Defendant's rights under the franchises terminated by their express provisions, and, because of the interest of a municipality in and to its streets, no such relation as a tenancy has been created or can exist.

The right of defendant was an incorporeal right, created for the public use, which imposed no additional servitude upon the public streets. This court has held that the use of the city street by a street railway is in furtherance of the business for which the street is established, and relieves the pressure of local business and local travel; that such railways are only a modern and improved use of the street as a public way and necessary in populous cities. "The use is the same, the method only different." *Detroit City Railway* v. *Mills*, 85 Mich. 634, 654 (48 N. W. 1007), and cases cited; citing and approving the dictum of the court in *Grand Rapids, etc., R. Co.* v. *Heisel*, 38 Mich. 66, 67 (31 Am. Rep. 306).

The defendant company never acquiesced in or accepted the terms imposed in case of the use of these streets by defendant after the expiration of the franchises. On the contrary, by written notice, the complainant was notified of its claim that the franchises had not expired, that the charges fixed for a further use of the streets were excessive and confiscatory, and that it would not accept the same. This position thus taken by defendant has been the subject of determination in this litigation. The cases cited by complainant in support of its contention are not in point, because the relations of the parties in those cases in no instance are similar to these in the instant case, and the subsequent user by defendant, having been in defiance of complainant's claim, did not establish an acceptance. While the cases cited to the effect that a municipality, on the expiration of the franchise of a street railway, may impose such terms as it sees fit for the further use, are accepted authority, none of them determine that they become operative without acceptance by the railway. No authority has been cited to the effect that a municipality

may arbitrarily, without consent of the grantee, impose terms upon a street railway in granting franchises. Such a holding would be repugnant to the universally accepted doctrine that such franchises are mutual contracts.

The contention is made on behalf of the defendant that the creation of the Michigan railroad commission took from the municipality of Detroit the right to locally control the operation of the Detroit United Railway, and much space is given to this contention in one of the briefs of defendant. We do not undertake to consider this argument at length, and can give but a brief outline of defendant's claims. The argument proceeds upon the assumption that street railways have been by the legislature placed upon the same footing as general railroads. Upon this hypothesis they claim the law to be settled that:

" (a) The franchise to be a corporation is a grant from the State.

" (b) The franchise to engage in the business of constructing, operating, and maintaining street railways comes from the State.

" (c) The franchise to charge toll for the carriage of passengers and freight over any railroad owned by the company is a franchise which comes from the State.

" (d) The right to occupy the public street or highway with a railroad and to construct, maintain, and operate a railroad upon the public streets or highways is a franchise granted by the State."

Having stated these four propositions to be the settled law, the argument proceeds upon the assumption that these included and provided for all the rights which a corporation endowed with these rights might require in order to proceed to construct, maintain, and operate a railroad upon the public streets. It is true that the authority to incorporate, to engage in the business of constructing and operating a street railway, to charge tolls for carrying passengers and freight, to occupy the public streets, emanates primarily from the State. The same is true of the fundamental rights of any corporation authorized to exist by the Constitution and laws of this State,

but it is also true that all municipalities of this State are given by statute the supervision and reasonable control of all public streets and highways, within their respective limits, and our attention is called to no provision of law to the contrary. This has always been the policy of this State, and in Const. art. 8, § 28, it is provided:

"No person, partnership, association or corporation operating a public utility shall have the right to the use of the highways, streets, alleys or other public places of any city, village or township for wires, poles, pipes, tracks or conduits without the consent of the duly constituted authorities of such city, village or township; nor to transact the local business therein without first obtaining a franchise therefor from such city, village or township. The right of all cities, villages, and townships to the reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and townships."

The laws authorizing the organization of companies to operate street railways within municipalities of this State all have provisions that corporations so organized are not authorized to enter upon and construct such railways without the consent of the municipality. The principle of local self-government has always been fostered in this State and upheld by this court. While the legislature, in establishing the Michigan railroad commission and fixing its powers, has given it certain specified rights relative to certain street railroads and interurban railways, yet it is evident from the particular legislation referred to that there was no legislative intent to reject the established policy of maintaining local self-government, and to institute a new policy in derogation thereof. Section 3c, of the Michigan railroad commission law, among other things, provides, after giving certain of these powers above referred to, as follows:

"*Provided further*, that nothing in this act contained shall apply to street and electric railroads engaged solely in the transportation of passengers within the limits of cities or within a distance of five miles of the boundaries thereof." [3 How. Stat. 2d Ed. § 6526, subd. c.]

The franchises involved in this litigation were all granted for a period not to exceed 30 years, and were grants solely for the transportation of passengers, and therefore come within the express proviso above quoted. It is apparent that the legislature had no intention of providing for interference by the Michigan railroad commission with the authority of municipalities over their streets, and the contention to the contrary is untenable.

The conclusion to be drawn from our determination of the different propositions discussed is that the contractual relations between these parties ended upon the expiration of the franchises, and all rights in the defendant company to occupy the city streets, and maintain and operate a street railway thereon, then terminated, and defendant thereafter became a trespasser; that complainant has the absolute and unquestioned right at any time to compel the defendant company to vacate the streets upon which these franchises have expired, and to require it to remove its property therefrom within a reasonable time, and, if necessary for that purpose, to enforce its rights by a writ of assistance from this court.

From this determination it does not follow that any rights of ownership in and to its property in the public streets used in the maintenance and operation of its railway are taken from it. On the contrary, it is the settled law that, after the expiration of a franchise of a street railway company, such property belongs to it. *Cleveland Electric R. Co.* v. *City of Cleveland, supra.* Such ownership necessarily carries with it the right of removal, and no arbitrary power is given to the complainant, or should be given to it, to proceed at once by force to effect such removal. Defendant is entitled to, and should be given, notice to remove its property within a reasonable time. In the disposition we have made of the questions involved we agree with the determination of the trial court, except in two matters:

(1) We have not declared that defendant has created a

nuisance in the streets in question, because we do not think such to be the logical conclusion to be drawn from this opinion. We hold that defendant is committing a continuing trespass, which entitles complainant to the relief indicated. (2) We have determined that complainant could not arbitrarily fix a fee for the use of these streets by defendant, from which conclusion it follows that this court cannot assume such power. A decree will be prepared and presented to this court, conforming with the conclusions of this opinion, providing for injunctive and other writs necessary to carry it into effect, and the cause will be remanded for further proceedings. Complainant will recover the costs of both courts.

MOORE, C. J., and STEERE, BROOKE, STONE, and OSTRANDER, JJ., concurred with McALVAY, J.

BIRD, J. I concur in the foregoing opinion, but in so doing I do not want to be understood as holding that the city may not recover damages in an appropriate proceeding for defendant's trespass in refusing to vacate the streets after the franchises expired.